### In re TOWN OF HIGHLANDS.

(Supreme Court, Special Term, Orange County. November 5, 1892.)

1. QUALIFICATIONS OF VOTERS—RESIDENCE ON UNITED STATES RESERVATION—WEST POINT.

Since the state of New York has ceded to the United States the territory comprising the West Point reservation, reserving nothing except the right to serve process therein, such territory has ceased to be subject to state jurisdiction, or to be a part of the state; and persons having no other qualifications as residents than a residence in such territory are not residents of the state, and have no right to vote.

2. SAME—EMPLOYES OF FEDERAL GOVERNMENT.

The mere fact that a person is in the service of the United States at West Point does not disqualify him as a voter, but he may vote in the place of his residence at the time he entered such service, or at his place of residence, if any, within the state, since acquired.

At chambers. Proceeding to strike from the registry list of voters of the third district of the town of Highlands the names of persons residing on the West Point military reservation.

Benjamin McClung, for the motion.
Michael H. Hirschberg, opposed.

BROWN, J. In this case the situation is somewhat familiar to me, because upon two other occasions I have had litigated questions before me which involved the political character of West Point. The first was in reference to the assessment of the railroad. The assessors of the town of Highlands included that part of the railroad which passes over the West Point reservation in the tax roll of the town, and an application was made by the West Shore Railroad to strike it out on the ground that they had no jurisdiction. The second case was an action brought to foreclose a mortgage which covered the right of way of the West Shore road through the West Point property, and the jurisdiction of the state court to entertain such a suit was challenged. I decided in the first case that the assessors of the town of Highlands had no jurisdiction over property at West Point, and that the property must be stricken from the tax roll. I decided in the second case that the state court had no jurisdiction to entertain a suit to foreclose a mortgage upon property upon West Point, on the ground that the West Point

reservation was not a part of the territory of the state of New York. The question of the political character of that property was examined, and very carefully argued, in the latter case, by able counsel, and no appeal was ever taken from either one of these decisions. Although nearly $1,000,000 was involved in the foreclosure suit, it was conceded that the territory was outside the state, and outside the jurisdiction of the state courts. The political character of property situated as this is was recently examined in the United States supreme court in a case reported in 114 U. S. 525, 5 Sup. Ct. Rep. 995, and all the law that anybody wants on the subject will be found in the report of that case. It is the case of Railroad Co. v. Lowe, and involved the character of government property at Ft. Leavenworth; and the supreme court, after referring to a great many authorities, laid down this rule: That, where the general government acquired the title to property without the consent of the state in which it is located, it held it as mere proprietors, with a title the same as any other individual owner, and the jurisdiction of the state over it remained subject only to the limitation that it could not legislate in such a way as to impair or destroy the purposes for which the property was acquired; but, where the general government obtained the property with consent of the state, there the political power of the state was transferred absolutely to the general government, except so far as was reserved in the act of cession; and Judge Field, speaking for a unanimous court,—there being no dissent on the subject,—after referring to a great many authorities, and discussing them very fully, said:

"When the title is acquired by purchase by consent of the legislatures of the state, the federal jurisdiction is exclusive of all state authority. This follows from the declaration of the constitution that congress shall have like authority over such places as it has over the district which is the seat of government; that is, of 'exclusive legislation in all cases whatsoever.' Broader or clearer language could not be used to exclude all other authority than that of congress; and that no other authority can be exercised over them has been the uniform opinion of federal and state tribunals, and of the attorneys general.

He further says, after citing numerous decisions:

"These authorities are sufficient to support the proposition which follows naturally from the language of the constitution,—that no other legislative power than that of congress can be exercised over land within a state purchased by the United States, with her consent, for one of the purposes designated; and that such consent, under the constitution, operated to exclude all other legislative authority."

In this case we all know that there are several acts of cession from the state of New York to the general government, reserving nothing except the right to serve process, civil and criminal, within the ceded territory, and under these authorities the territory of West Point ceased to be a part of the state of New York. That state legislature has no authority to legislate in reference to it. Prior to the decision referred to the authorities were uniform on the subject. In this state, in addition to the two cases which were before me, there is a case reported in one of Howard's Reports (Dibble v. Clapp, 31 How. Pr. 420) which held the same thing. In Massachusetts, in an early case before Judge Story, in the United States circuit court, (U. S. v. Cornell,) reported in 2

Mason, 60, a criminal case, he held that the state had no authority to punish a man for murder committed at Ft. Adams; and in another Massachusetts case, at Springfield, it was held that the state courts had no jurisdiction over crimes committed on government property. And in the opinion of the attorneys general, which Judge Field refers to, the question arose as to whether parties residing at Harper's Ferry, within the limits of the armory, the lands composing which had been purchased by consent of the state, were subject to taxation by the state; and, the question having been submitted to the attorney general, he replied "that the sole object and effect of the reservation as to the service of criminal process was to prevent the place from becoming a sanctuary for fugitives from justice for acts done within the acknowledged jurisdiction of the state. That in all other respects the extraterritoriality of the armory at Harper's Ferry was complete, in so far as regards the state; but the persons in the employment of the United States, actually residing within the limits of the armory, did not possess the civil and political rights of citizens of the state, nor were they subject to taxation, and other obligations of citizens."

It is unfortunate that this question comes up on the eve of an exciting election, because it attracts attention, and people get more or less excited about it; but, in all cases where the questions have arisen in respect to rights other than voting, the decisions are uniform, and pass without challenge.

We turn to the question of the right of these people to vote. That has been decided in numerous cases. In the case of Com. v. Clary, 8 Mass. 72, the supreme court of Massachusetts held that the people on the government property at Springfield had no right to vote, and the question also arose, and was decided, in a case reported in 1 Metc. 583, (Supp.) That was not a litigation, but a case where the house of representatives of Massachusetts requested the opinion of the judges of the supreme court of Massachusetts, and they held "that persons residing within the territory ceded to the government do not acquire the civil and political privileges, nor do they become subject to the civil duties and obligations, of inhabitants of the towns within which such territory is situated." And there is a case of Sinks v. Reese, in 19 Ohio St. 306, which was an election case in the nature of a quo warranto, where the election turned on the question whether the people residing in the national asylum for disabled volunteers had the right to vote. That was a national institution, upon property purchased by the general government, and ceded to the United States; and it was held in that case —and it is cited by Judge Field in the Leavenworth Case with approval—"that upon the purchase of the territory by the United States, with the consent of the legislature of the state, the general government became invested with exclusive jurisdiction over it and its appurtenances, in all cases whatsoever, and that the inmates of such asylum, resident within the territory, being within such exclusive jurisdiction, were not residents of the state, so as to entitle them to vote." So, as Judge Field says, there is a uniform current of authority from the beginning of the government down to the decision of this case in 1884,—all

to the effect that this territory is not part of the state. When you apply this rule to this case, it excludes all state authority whatever. These inspectors act under a state law, as the assessors do, and the judges do, under the constitution of the state. They have no right to put any person upon the registry list except qualified voters, and those qualifications are prescribed in the constitution, and they are, among others, that a man must be a resident of the state. In the argument of counsel the District of Columbia is spoken of. There is no distinction, and can be none, between the resident of the District of Columbia and West Point. You will see in the constitution of the United States the provision as to jurisdiction is all in the same section. The constitution of the United States provides that "congress shall have power to exercise exclusive legislation in all cases whatsoever over such district (not exceeding ten miles square) as may, by cession of particular states, and the acceptance of congress, become the seat of the government of the United States, and to exercise like authority over all places purchased by the consent of the legislature of the state in which the same shall be, for the erection of forts, magazines, arsenals, dock yards, and other needful buildings." We all know that the District of Columbia was ceded by the state of Maryland to the United States, and no resident of the District votes anywhere; and of course a resident on the West Point property occupies the same relation to the government and the state of New York as a resident of the District of Columbia does to the state of Maryland. He has no right to vote. The effect of this is to exclude from the right to vote persons who have no other qualifications as residents except a residence on the West Point property. I very readily see that there may be people there who have the right to vote in the town of Highlands, as there may be persons who have a right to vote in other parts of the state, or in other states. The constitution of this state provides that nobody gains or loses a residence by employment in the United States government, and while I mean to hold that a person resident upon West Point, and having no other qualification as a resident of the state except such as he gains from a resident on West Point, is not a resident of the state, and not qualified to vote, yet I mean to hold that the mere fact of being in the employment of the government does not destroy his right to vote, and he may vote in the place of his original residence, which existed at the time he went into employment of the government, or at his place of residence, if any, within the state, since acquired. If it was at Highland Falls, he has a right to vote there, provided he is registered in the proper district; and, if in another part of the state, he has a right to vote there. There is no escape from these authorities; and while I mean to follow the order of Judge Barnard, made in the individual cases referred to by counsel, I think his decision is in conflict with the universal line of authority in the United States supreme court, and the courts of this and other states. You can apply this rule to the individuals, and sift out those who are entitled to vote.